Dianne Colette HEAD, Respondent,

v.

**METROPOLITAN LIFE INSURANCE COMPANY, et al., Defendants.**

**Appeal of Gerry STEELE.**

**No. C6-89-1035.**

Court of Appeals of Minnesota.

Dec. 19, 1989.

Review Denied Feb. 21, 1990.

Sheryl Ramstad Hvass, William J. Egan, Rider Bennett Egan & Arundel, Minneapolis, for respondent.

Gary M. Johnson, George G. Eck, Dorsey & Whitney, Minneapolis, for appellant.

Heard, considered and decided by RANDALL, P.J., and FOLEY and LANSING, JJ.

## OPINION

FOLEY, Judge.

An August 13, 1987 judgment and decree dissolved the marriage of respondent Dianne Colette Head and Carlton LeRoy Head. No appeal was brought from the judgment. On August 10, 1988, Carlton died unexpectedly. Dianne then commenced this related lawsuit in the same district court, claiming the dissolution decree entitles her to the proceeds of an insurance policy on Carlton's life. Appellant Gerry Steele, a co-beneficiary of Carlton's life insurance policy, now appeals a summary judgment placing a constructive trust in favor of Dianne on the disputed life insurance proceeds. We affirm.

### FACTS

#### The Dissolution Action

Dianne, age 48, and Carlton, age 53, were married in 1960. Dianne was primarily a mother and homemaker during the marriage and was not employed outside the home for over 25 years.

Dianne has hypertension and pemphigus, a skin disease now apparently in remission as a result of medication. The trial court found she was often fatigued and lacked physical stamina. The trial court further found Dianne was virtually unemployable at the time of the dissolution, and even with substantial vocational and psychological counseling was not likely to get a job paying more than $14,000 a year. Carlton's earning capacity was found to be substantial. Dianne's reasonable monthly expenses were found to be $2,150; Carlton's were $2,453.

The parties sold the marital home and divided the proceeds. Life insurance policies in effect on Carlton's life were cashed in and the money divided between the par-

ties. Dianne was awarded $93,009 in marital assets and $50,000 in nonmarital assets. Carlton was awarded $88,031 in marital assets.

At the time of the dissolution trial in April 1987, Carlton's 13-year job with Honeywell was ending. On May 26, 1987, after trial but before entry of the dissolution judgment and decree, Carlton obtained employment with Prime Computer.

The trial court found Carlton had a net monthly income from his new job of $2,444, but noted it likely he would make more after a training period elapsed. Dianne was awarded spousal maintenance of $1,000 a month until her death or remarriage. In its conclusion of law No. 2, the trial court said:

> Either party may move the Court for a re-evaluation of the spousal maintenance one year from the date of this judgment and decree and no change in circumstances need be shown since the incomes of the Petitioner and Respondent are subject to change at this time.

The dispute before this court concerns a decree provision requiring that Carlton name Dianne beneficiary of employment-provided life insurance as security for spousal maintenance.

The following colloquy took place at the dissolution trial:

BY [CARLTON'S ATTORNEY]:

Q. Mr. Head, you know, hopefully you are going to get a job and hopefully you will get a job with a company that has a group life policy?

A. Hopefully.

Q. Would you be willing to agree that if and when that happens that you would make your wife the beneficiary of that group policy?

A. Is that a requirement?

Q. It's not a requirement. I'm just asking if you are willing to do that because of the difficulty that I have been discussing earlier on these other policies?

A. I guess I don't understand my options enough to say yes or no on that.

THE COURT: Well, maybe I should explain to you that if this Court—which I think in this case there is no question there will be some spousal maintenance—to protect the spousal maintenance, the Court would order you to maintain a certain amount to protect that during the course of those payments. So you don't have to agree.

THE WITNESS: A certain amount then, okay.

[CARLTON'S ATTORNEY]: If I could just tell the client, Your Honor.

Q. ([Carlton's attorney], continuing.) As the Court indicated that it's traditional that there is some life insurance that's to be made available in case, you know, you get hit by a truck?

A. So you are saying in part or in whole or what or just a certain level?

Q. Typically—you know, I don't know to what employer you are talking about. Most employers, you know, and it's hard for me to give you any specifics, but as a fringe benefit larger companies usually provide some sort of group life which apparently you don't have at Honeywell, do you?

THE COURT: Oh, yes.

THE WITNESS: Yes, there is group life at Honeywell.

Q. ([Carlton's attorney], continuing.) How much is that?

A. I don't know. That information was turned over a long time ago.

Q. What I'm talking about is something similar to that because the concern I have is that the Court will order these particular policies be kept in force. We are tying up a lot of cash values and that's why I'm saying an appropriate option—

A. Okay.

Q. —might be that you get—

A. I understand, yes.

Carlton's deposition was taken after trial and after he obtained his new job. He gave generally vague testimony about the amount of life insurance he had through his job at Prime Computer, "guessing" it was about $128,000. Carlton testified he

had made Dianne and Steele each 50% beneficiaries of the policy.

Conclusion of law No. 5 states:

*Life Insurance to Secure Spousal Maintenance.* That the Petitioner shall keep and maintain in full force and effect the policy or policies of life insurance available through his employment on himself, naming the Respondent beneficiary thereof, until the Petitioner is no longer obligated to provide spousal maintenance. Should Petitioner fail to maintain Respondent as beneficiary, then Respondent shall have a claim against Petitioner's estate for said amount.

Dianne moved for re-evaluation of the spousal maintenance and scheduled a hearing for August 9, 1988. At Carlton's request, the hearing was continued until October 12, 1988. Hearing was never had because of Carlton's death.

### The Present Action

It was learned after Carlton's death that at the time of the dissolution his employer paid for $60,000 worth of insurance and Carlton paid, at a low rate, for another $180,000, for a total of $240,000 of insurance. At the time of his death, the respective figures were $70,000 and $210,000, or a total of $280,000. The amount of life insurance Carlton could get varied with his income. Dianne and Steele were designated as co-beneficiaries.

After Carlton's death, Steele filed a claim as a co-beneficiary of the insurance. Dianne filed a claim for all of the insurance. The insurer denied Dianne's claim, and said it would give each beneficiary one-half of the proceeds. This litigation resulted.

### ISSUES

1. Did the trial court err in interpreting the dissolution decree to entitle Dianne to receive the entire proceeds of Carlton's job-related life insurance?

2. Did the trial court err in imposing a constructive trust?

### ANALYSIS

1. To evaluate the trial court's interpretation of the decree, we must first determine whether an agreement was reached as to the life insurance provision. Our review of the record shows it supports the trial court's finding that no agreement was reached.

In their summary judgment memoranda, Steele and Dianne took the position an agreement had been reached, but disputed what it was. Dianne argued she would be the beneficiary of all life insurance Carlton got from his new job. Steele argued Dianne would have claim only to an amount set by the court necessary to protect payment of spousal maintenance. Steele further argued Dianne would have claim only to life insurance paid for by Carlton's employer, not any extra Carlton might purchase.

The trial court found Carlton did not agree to carry *any* insurance to benefit Dianne after the dissolution. The trial court also noted Carlton's failure to make any proposal regarding life insurance, even though requested by Dianne in her post-trial submissions. Furthermore, the trial court indicated to Carlton that he did not have to agree as the court would decide the issue.

It is undisputed a court has jurisdiction to interpret and clarify a judgment which is ambiguous or uncertain on its face, even after the time for appeal has passed. *Palmi v. Palmi*, 273 Minn. 97, 103, 140 N.W.2d 77, 81 (1966). Whether language is ambiguous is a question of law. *Halverson v. Halverson*, 381 N.W.2d 69, 71 (Minn.Ct. App.1986).

■ As noted, the first sentence of the body of the disputed provision reads:

That the Petitioner shall keep and maintain in full force and effect the policy or policies of life insurance available through his employment on himself, naming the Respondent beneficiary thereof, until the Petitioner is no longer obligated to provide spousal maintenance.

By itself, this provision clearly says Dianne was to get all of the job-related life insurance.

Steele argues, however, that ambiguity arises because of the caption to the provision. She argues that "Life Insurance to Secure Spousal Maintenance" indicates the purpose of the insurance was to provide "security" for the spousal maintenance, not to give Dianne rights as part of the property division. Steele says a requirement that an obligor "maintain" life insurance to "secure spousal maintenance" by "naming" the obligee spouse as "beneficiary thereof" can only be consistent with the purpose of security if it is read to mean the obligee spouse has a right to no more insurance than an amount actually necessary to secure spousal maintenance at the obligor's death.

Steele's attempt to find ambiguity puts great weight on her definition of security in the face of the clear language that Dianne was to be the beneficiary of all job-related life insurance. Nothing in the decree defines "security," and Steele resorts to arguing either the trial court agreed to set a certain limited amount of life insurance to which Dianne was entitled or the law should have so required.

While we do not find the decree provision to be ambiguous, the result would be the same in either case because the trial court's interpretation of the decree as entitling Dianne to the full amount is supported by the evidence.

In interpreting the decree, the trial court found it would have been superfluous to use the word "sole" in front of the singular word "beneficiary," and noted the decree did not say "a beneficiary," "co-beneficiary" or "one of the beneficiaries." The trial court determined its intent was clear that Dianne be the only beneficiary, otherwise the provision would be meaningless. The trial court also found its intent was clear that Dianne be the beneficiary of all life insurance Carlton obtained at his place of employment. The trial court noted it would have said so if it had meant Carlton need only maintain so much insurance as he unilaterally determined was necessary to fund $1,000 per month spousal maintenance, and it would have said so if it had meant Carlton only had to maintain the insurance provided and paid for by his employer. The trial court commented it was without information about the insurance because Carlton did not give the information to the trial court.

█ The construction of its own decree by a trial court must be given great weight in determining the trial court's intent. *Palmi*, 273 Minn. at 104, 140 N.W.2d at 82; *Mikoda v. Mikoda*, 413 N.W.2d 238, 242 (Minn.Ct.App.1987), *pet. for rev. denied* (Minn. Dec. 22, 1987). Interpretations of dissolution decrees should render them reasonable, effective and conclusive and make them harmonize the facts and law of the case. *Palmi*, 273 Minn. at 104, 140 N.W.2d at 82. There is no merit in Steele's argument that the trial court's interpretation of the decree is contrary to the applicable law at the time of the decree.

█ We hold Minnesota law at the time of the decree did not impose an obligation for a trial court to arrange for a trust or annuity for use in the event of the death of an obligor ordered to secure maintenance. Thus there is no implication that security be strictly equivalent to the obligation. The law then was as it is now: The trial court must simply make a reasonable award. *See O'Brien v. O'Brien*, 343 N.W.2d 850, 853 (Minn.1984) (in an exceptional case, reasons justifying permanent support justify security); *O'Donnell v. O'Donnell*, 412 N.W.2d 394, 398 (Minn.Ct. App.1987) (wife's situation warrants security). The decision whether to require security and how much under the circumstances, lies within the broad discretion of the trial court. *Arundel v. Arundel*, 281 N.W.2d 663, 667 (Minn.1979); *Laumann v. Laumann*, 400 N.W.2d 355, 360 (Minn.Ct.App. 1987), *pet. for rev. denied* (Minn. Nov. 24, 1987).

Minnesota cases which have upheld requiring life insurance as security for support have used a different concept from that advanced by Steele. Our supreme court recognized that

in the exceptional case the reasons which justify granting permanent alimony * * * [such as] the long duration of the marriage and [a party's] age and lack of marketable skills, also justify the securing of that alimony.

*Arundel,* 281 N.W.2d at 667. This holding was reaffirmed by the supreme court when it remanded *O'Brien* to the dissolution trial court for the trial court to consider providing life insurance, saying it was an "exceptional case" where life insurance on the obligor's life would afford his former wife "a measure of security for loss of maintenance in the event her husband should predecease her." *O'Brien,* 343 N.W.2d at 853. Similarly, this court has held there should be life insurance because the situation warranted the "security" the spouse getting maintenance needed in the event the obligor died. *O'Donnell,* 412 N.W.2d at 398.

It is obvious this is a different kind of security from that contemplated by Steele. This is not security to ensure payment is made. *This is security for the spouse in need of maintenance.*[1]

We find the trial court's interpretation harmonizes the facts and the law of the case. We note the following special circumstances: Carlton left the trial court with no choice other than awarding Dianne the entire insurance because Carlton did not fully inform the court about the insurance; the $1,000 per month maintenance award was interim because of uncertainty about Carlton's income at his new job and Dianne's earning capacity; the $1,000 was substantially below the $2,400 found to be Dianne's reasonable monthly expenses; and Dianne's health problems and absence from the workplace for 25 years. These facts indicate this was an "exceptional case."

While Steele acknowledges no Minnesota case has interpreted "security" to mean an obligee spouse only has an interest in the amount necessary to fund further spousal support, she points to *In re Estate of Monreal,* 126 Mich.App. 60, 337 N.W.2d 312 (1983), *aff'd,* 422 Mich. 704, 375 N.W.2d 329 (1985), where the Michigan court held insurance to secure child support should go to the obligor's estate after the support obligation ended at the majority of the last child.

*Monreal* is not on point. There, the parties had stipulated child support would be paid only during the minority of the children and the obligor father had conspicuously left the children out of his will. Nor has *Monreal* been adopted in Minnesota. *Thiebault v. Thiebault,* 421 N.W.2d 747, 748 (Minn.Ct.App.1988), cites *Monreal;* however, *Thiebault* upheld the trial court's outright grant of insurance to the daughter with no discussion of how much was actually necessary to satisfy the remaining support obligation.

The trial court did not err by not setting a definite amount of insurance for Dianne's benefit. Given the multitude of contingencies, it is not reasonable to ask for mathematical precision. For example, in *Trimble v. Trimble,* 218 Neb. 118, 352 N.W.2d 599 (1984), the Nebraska court held it was not unreasonable to require life insurance that could have discharged the ordered payments twice over. *Id.* at 121, 352 N.W.2d at 601.

■ Nor do we find the decree as interpreted to be contrary to the statutory mandate that a decree expressly so provide if spousal maintenance is to continue after the obligor's death. *See* Minn.Stat. § 518.64, subd. 3 (1988). This requirement can be satisfied by a decree, as here, that provides funding such as an insurance poli-

---

1. This court is unaware of any reported Minnesota case wherein an obligation to have life insurance in connection with spousal maintenance is tied to statutory authority to require security. Minn.Stat. § 518.24 authorizes appointing a receiver or requiring security be given for payment of maintenance. Minn.Stat. § 518.61 authorizes the appointment of a trustee to handle maintenance remittances. The cases which have referred to these statute sections generally have been situations where a still living obligor has failed in meeting a maintenance or support obligation. *Peterson v. Peterson,* 304 Minn. 578, 231 N.W.2d 85 (1975); *Zagar v. Zagar,* 396 N.W.2d 98 (Minn.Ct.App.1986); *Sullivan v. Sullivan,* 393 N.W.2d 521 (Minn.Ct.App. 1986). In those situations, the kind of "security" Steele espouses might be more appropriate.

cy. *Witt v. Witt*, 350 N.W.2d 380, 382 (Minn.Ct.App.1984).

Steele argues that this is a case of first impression. In doing so, she has acknowledged no Minnesota case has held life insurance must be an exact match with a maintenance obligation. She has also shown the interpretation of the decree by the trial court is consistent with the law in effect at the time of the decree. An interpretation of a decree cannot apply law which had not been articulated at the time of the decree. *Mikoda*, 413 N.W.2d at 243.

If Carlton wanted a change in the law, he could have appealed from the decree. He did not, and the judgment became final. Steele, a third-party stranger to the dissolution action, should not now be allowed to suggest changes in the law to be retroactively applied to the time of the decree and to this decree.

■ 2. We find no error in the trial court's imposition of a constructive trust on the insurance proceeds designated for Steele. Steele argues Dianne's sole remedy is against Carlton's estate.

We disagree. As we said in *Taylor v. Taylor*, 413 N.W.2d 587 (Minn.Ct.App. 1987):

> [T]he probate court would have exclusive jurisdiction over this action only if the subject matter, the rights in question, and the parties to the probate litigation are identical. In this case, the probate claim is against the decedent, not [the second wife]. The legal theories involved in the two actions differ, and appellant has not shown that the probate court has jurisdiction over her or the insurance proceeds. No grounds appear for barring this action.

*Id.* at 590 (citing *State ex rel. Minnesota National Bank v. District Court*, 195 Minn. 169, 173, 262 N.W. 155, 157 (1935).

The fact the personal representative of the estate has been brought into this action does not change the result. Even if Dianne has an opportunity to claim against the estate, this court held in *Taylor* that the obligees' claims to the insurance were not barred by their concurrent probate claim.

*Id.* Furthermore, any action against the estate here would be in equity, not at law.

■ Nor do we find merit in Steele's argument the decree created no legally cognizable lien on the insurance. Steele argues she is a valid contractual beneficiary of the insurance free of claims against Carlton or his estate; however, Dianne has a superior equitable interest in the insurance by virtue of the dissolution decree. We find this case to be analogous to *Simonds v. Simonds*, 45 N.Y.2d 233, 380 N.E.2d 189, 408 N.Y.S.2d 359 (1978), where the court held:

> Whatever the legal rights between insurer and insured, the separation agreement vested in the first wife an equitable interest in the insurance policies then in force. * * * This interest is superior to that of a named beneficiary who has given no consideration, notwithstanding policy provisions permitting the insured to change the designated beneficiary freely.

*Id.* at 239, 380 N.E.2d at 192, 408 N.Y.S.2d at 362.

A court is bound by no unyielding formula in deciding whether to impose the equitable, remedial device of a constructive trust. *Thompson v. Nesheim*, 280 Minn. 407, 414, 159 N.W.2d 910, 916 (1968). Under Minnesota law, a constructive trust arises where a person has an equitable duty to convey property to another and, if allowed to keep the property, would be unjustly enriched at the other's expense. *Marquette Appliances, Inc. v. Economy Food Plan, Inc.*, 256 Minn. 169, 97 N.W.2d 652, 654 (1959).

We hold Dianne is entitled to the entire funds being held in district court and they are ordered distributed to her. Because our decision has rendered moot the estate's request that we find Dianne has no valid claim against the estate, we do not reach that issue.

Because we affirm the trial court in this matter, the motion by Dianne to strike the brief filed by Julie Head as personal representative of Carlton's estate is granted.

## DECISION

Affirmed.

RANDALL, Judge, dissenting.

I respectfully dissent. I would distribute the life insurance proceeds of $280,000 equally to the co-beneficiaries, as I find that division most closely resembles the letter and spirit of the divorce decree, and letter of the controlling life insurance contract between decedent Carlton Head and Metropolitan Life Insurance Company. The trial court, in the original dissolution proceeding, ordered Carlton to pay Dianne:

as and for spousal maintenance, the sum of $1,000 per month, * * * commencing January 1, 1987, until [Dianne's] death or remarriage, whichever occurs first.

To secure these maintenance payments, the trial court made the following provision:

*Life Insurance to Secure Spousal Maintenance.* That the Petitioner shall keep and maintain in full force and effect the policy or policies of life insurance available through his employment on himself, naming the Respondent beneficiary thereof, until the Petitioner is no longer obligated to provide spousal maintenance. Should Petitioner fail to maintain Respondent as beneficiary, then Respondent shall have a claim against Petitioner's estate for said amount.

The purpose for this requirement is clear. The trial court intended to ensure that Dianne would continue to receive maintenance payments upon Carlton's death. The trial court had authority to require security for the spousal maintenance payments. *See Arundel v. Arundel,* 281 N.W.2d 663, 667 (Minn.1979) (trial court may order purchase of life insurance to secure permanent alimony).

The facts of this case make clear that the trial court left open the question of future adjustment to the amount of maintenance. As pointed out by the majority, the trial court expressly provided that either party could move "for a re-evaluation one year from the date of the judgment * * * and no change of circumstances need be shown * * *." Dianne filed a motion for re-evalu-

ation. However, Carlton died unexpectedly, and the motion was never heard.

Upon Carlton's death, the trial court's original spousal maintenance order became final and not subject to modification or amendment. *Witt v. Witt,* 350 N.W.2d 380, 382 (Minn.Ct.App.1984). Thus, the amount of maintenance Dianne is to receive until she dies or remarries is fixed at $1000 per month.

The trial court's subsequent "interpretation" of its order requiring life insurance to secure maintenance as mandating that Dianne receive the entire proceeds of the policy, regardless of how much the policy is worth, became an improper post-death amendment to the original decree. *Witt* holds that an amendment to a decree made after the death of the obligor is invalid. *Id.* The "interpretation" also conflicts with the purpose for which Carlton was required to maintain life insurance—to secure spousal maintenance.

Courts in other jurisdictions when faced with similar situations have held that an obligee spouse is entitled to receive only as much of the proceeds of an insurance policy as is necessary to properly secure the future maintenance or support obligations in issue. *See Serrano v. Hendricks,* 400 N.W.2d 77, 79 (Iowa Ct.App.1986); *Johnson v. Sporalsky,* 55 Or.App. 193, 197, 637 P.2d 638, 640 (1981). These courts reason that the purpose for which the obligor is required to maintain insurance governs the determination of how much of the proceeds the obligee receives. This is a logical, common-sense approach. I do not find *Trimble v. Trimble,* 218 Neb. 118, 352 N.W.2d 599 (1984), a case cited by the majority, giving us any guidance on our facts. I do not dispute that if the original decree had specified a *particular amount* of insurance, that amount, whether mathematically less, equal to, or more than would be needed to produce $1000 a month, could be required. However, here the trial court did not specify a particular amount, but made a general provision for life insurance to secure spousal maintenance. That is precisely what appellant did. Even though the obligee spouse was named as a co-beneficiary rath-

er than a sole beneficiary, no injustice was done to either the terms of the court order or to respondent, as 50% of the net proceeds was plainly sufficient to fulfill all of appellant's monetary obligation.

Carlton was required to maintain insurance to guarantee that Dianne would receive monthly spousal maintenance payments. The trial court set the amount of these payments at $1000 per month. One-half of the proceeds of Carlton's life insurance policy, $140,000, will either purchase Dianne an annuity that will pay her approximately $1000 per month for the rest of her life or, if invested in a safe, secure interest or dividend bearing instrument, would pay her approximately that amount *and* she would retain full access and use of the principal if needed, something a court ordered promise to pay via a dissolution decree never provides.

Ironically, Carlton provided Dianne with *more* security by dying than he could have by living. Any number of contingencies could have affected Carlton's ability to continue to pay maintenance during his lifetime. Carlton could have lost his job, gotten a lower paying job, suffered an injury and become disabled, or Dianne could remarry. In any of these situations, his maintenance obligation to Dianne would have been reduced or eliminated. Now, with 50% of the life insurance proceeds as co-beneficiary, Dianne can unconditionally guarantee herself that $1000 per month for life with no contingencies, and she even preserves the right to remarry. Dianne no longer has to worry about Carlton's future earning capacity or life expectancy. These unconditional funds are worth far more to Dianne than the decedent's legal obligation to make maintenance payments. The $140,000 that Carlton intended to leave Diane unconditionally will provide her about $1000 a month for the rest of her life. There is no just or equitable reason to make an issue of what to do with the remaining $140,000, nor is there any legal or equitable reason to set aside Carlton's valid insurance contract which designates Steele as co-beneficiary with Dianne. There is a complete absence of inequity if Dianne is awarded $140,000 of life insur-

ance proceeds rather than the $280,000. *See In re Estate of Eriksen*, 337 N.W.2d 671, 674 (Minn.1983) (constructive trust may be imposed when necessary to prevent unjust enrichment).

I would have reversed the trial court's decision to award Dianne the entire $280,-000. The trial court's subsequent interpretation of its original decree directly conflicts with the purpose for which Carlton was required to maintain life insurance—to secure the $1000 per month spousal maintenance. One-half of the proceeds is sufficient to secure Dianne $1000 per month for life. Since Dianne is not prejudiced by Carlton's designation of her as co-beneficiary under the policy with Steele, I would not set aside an otherwise valid insurance contract and impose a constructive trust on Steele's share of the proceeds of the insurance contract. I dissent.